**David Oscar OPPENHEIMER and Gladieux Food Services, Inc., Appellants,**

v.

**Sharon SMITH, Appellee.**

Court of Appeals of Kentucky.

June 28, 1974.

Rehearing Denied Sept. 13, 1974.

William A. Miller, Louisville, for appellants.

John Douglas Hubbard, John S. Kelley, E. E. Hubbard, Fulton, Hubbard & Kelley, Bardstown, J. Chester Porter, Thomas B. Givhan, Givhan & Porter, James E. Milliman, Shepherdsville, for appellee.

GARDNER, Commissioner.

Pursuant to a jury verdict in an automobile accident case appellee was adjudged recovery from appellants in the sums of $189.68 for doctors' bills, $25,000 for loss of wages and $75,000 for pain and suffering.

Gladieux Food Services, Inc., operated the Holiday House Restaurant. Robert Shelton was the manager of Holiday. Gladieux provided Shelton with a station wagon to use in the business of Holiday, as well as to use to drive to and from work. At the time of the accident the station wagon was being driven by David Oscar Oppenheimer, an employee of Holiday, with permission of Shelton who was also in the station wagon. The station wagon struck a car being driven by Francis Smith, in which Sharon Smith was a passenger. It was conceded that the driver of the station wagon was entirely to blame for the accident.

The issue of whether Oppenheimer was an agent of Gladieux and acting within the

scope of his employment is so crucial that a comprehensive resume of the testimony of the only two witnesses touching on the issue is in order. According to Shelton and Bobby Ray Miller, an employee of Holiday, several "employees," "gas station people," "state people" and "families of employees" gathered about 6:30 in the afternoon to play softball at the high school field about 300 yards from the restaurant. Shelton obtained permission for the use of the ball field. This was almost a weekly affair. Usually the participants brought food and drinks. The team was not a member of a league and their usual opponent was another unorganized team made up mostly of employees of Dock's Restaurant. Often the participants chose up among themselves. Girls as well as boys played. All balls, bats and other equipment were furnished by the participants. No uniforms were provided by Holiday, nor did it furnish any food or drinks or any other items used at the games. There is no evidence that the policy-making authorities of either Gladieux or Holiday were even aware of the meetings. Shelton was asked, "The idea behind these little get-togethers was to give the employees a chance to get to know each other better and to—in a social atmosphere, isn't that right?" Shelton answered, "It had some bearing on it. For my own personal reasons I enjoy playing softball." The get-togethers seem to have been initiated by Oppenheimer earlier in the summer. Shelton testified:

"Well, originally the whole idea of playing softball was formulated by David in trying to—he's from Seattle, Washington, and he—this happened in the beginning of the summer; he had only been here a couple—three weeks I guess, and he was wanting to get to know the kids and the—Kentuckians; it's new to him; he's interested in this, and he's very interested in people, and he got this whole thing started of playing ball, and it kind of picked up, and I guess as things went on, as the ballgames progressed more and more people

attended, both company employees and again ex-employed and relatives, friends, and people that sell to us, and state people also, state employees."

Miller stated that the group "played each week for the fun of it," that "Mr. Shelton sponsored the Holiday House team," and that he guessed Mr. Shelton arranged for the ball field. On the day of the accident members of the group did not bring food because of threatening rain, so after the ball game Shelton suggested that they go to Louisville to a Pizza Hut. Many took their own cars and a few left their cars at the restaurant and rode in the station wagon. It was on the way back from the Pizza Hut that the accident occurred.

■ To establish that Oppenheimer was an agent of Gladieux it was incumbent upon appellee to produce evidence in addition to the fact that Shelton was permitted to use the station wagon for his own use as well as in behalf of the company. It was necessary to show that Shelton was on business of the company at the time and place of the accident. See Weldon v. Federal Chemical Company, Ky., 378 S.W.2d 633 (1964). Appellee argues that the evidence as a whole raised a presumption that Shelton was on business of the company and that Gladieux failed to present evidence sufficient to overcome the presumption. The cases cited by appellee in support of her contention are distinguishable from the present case upon their facts.

■ We are of the opinion that appellee failed to establish an agency relationship and that the court should have directed a verdict in Gladieux's favor.

■ Appellant Oppenheimer contends that the verdict was excessive. Appellee was 23 years of age and for three years had worked as a key-punch operator for a printing company at wages of $75 per week. She quit work during her pregnancy and was still not working at the time of the accident although the child was three months old. Appellee stated that she want-

ed to return to work after the accident but her back hurt so she could not sit very long at one time. She testified that she could do housework except vacuuming and lifting items "if my back wasn't hurting * * *." She stated that sometimes her back hurt all day and that for some time it had not gotten better or worse.

Dr. Charles M. Hargadon testified that appellee received compression fractures of approximately 20 percent in both the L–2 and L–5 vertebrae areas. The doctor recommended that appellee use a supporting corset. After approximately 11 months of periodic examinations she was discharged by the doctor. In his opinion the fractures had healed and there should be no functional problem. He stated, however, that it was possible that pain could be experienced for "a year, ten years or forever," and that those people having compression fractures showed early degenerative changes in the area of the spine as they got older.

Dr. George McCrocklin testified, "It is my impression that, or it's my opinion that the patient suffered fractures of L2 and L5 vertebrae and has a permanent residual in the form of impairment of the back as a result of the accident of June 1970." Dr. McCrocklin testified also that the fractures caused a change in the alignment of the vertebrae and "I think that after almost a year and a half she's over the direct result of the injury, that the tenderness is now a degree of back strain which results from the change in alignment. Also this is still the body attempting to adjust to this change." He also testified, "This I think, because of the change in alignment, will or likely result in a back that is more susceptible to trouble, that it will be more susceptible to wear and tear, that the patient will likely have a degree of arthritic changes in these joints that I mentioned." Dr. McCrocklin was asked, "Doctor is this injury and these things that you have described permanent in nature?", to which he replied, "Yes."

In view of the evidence we are of the opinion that the verdict was not excessive.

We find no merit in appellants' contentions that the instructions were erroneous or that there was misconduct on the part of appellee's counsel resulting in prejudicial error.

■ Appellants contend that the court erred in excluding the deposition of Dr. Stanley Collis. The deposition was taken during the term of court in which the case was tried, and under the rules of that judicial district depositions could not be taken in any pending case during that court's term and all depositions in cases must be taken at least 10 days prior to the beginning of the term of court in which the case was to be tried.

CR 83 provides, "* * * In all cases not provided for by rule, the circuit courts may regulate their practice in any manner not inconsistent with these rules." We view the restrictions contained in the rules of the Bullitt Circuit Court on when depositions may be taken as being inconsistent with CR 30.01, which says, "After commencement of the action, any party may take the testimony of any person, including a party, by deposition upon oral examination. * * *." Of course, if in a given case the notice to take depositions was unreasonable (see CR 30.02(1)), the court could grant proper relief, or, as provided in CR 30.02(3), "The court may for cause shown enlarge or shorten the time for taking the deposition." The difficulty encountered in the present case could have been prevented by a proper pretrial order. CR 16. We are of the opinion that the rules of the Bullitt Circuit Court restricting the time for taking depositions were invalid and the deposition of Dr. Collis should not have been excluded on the basis of the local rules.

The judgment is reversed as to Gladieux Food Services, Inc., with directions that if the evidence is substantially the same on another trial the court shall direct a ver-

dict in favor of Gladieux. The judgment is reversed as to Oppenheimer for a new trial on the question of damages for loss of wages and for pain and suffering.

All concur.