**Erma Rae WOOD, on Behalf of Herself and All Others Similarly Situated, Appellants,**

v.

**WYETH–AYERST LABORATORIES, DIVISION OF AMERICAN HOME PRODUCTS; A.H. Robins Company, Appellees.**

**No. 2000–SC–1067–DG.**

Supreme Court of Kentucky.

Aug. 22, 2002.

---

**29.** KRS 501.060(4).

**30.** *United States v. Main, supra* note 19 at 1050.

**31.** *Jackson v. Commonwealth,* Ky.App., 717 S.W.2d 511, 514 (1986).

John R. Shelton, Parker & O'Connell, PLLC, Louisville, for Appellant.

William D. Grubbs, Jann B. Lodsdon, Kristin M. Lomond, David T. Schaefer, Richard H. Clay, Stephen D. Weisskopf, Woodward, Hobson & Fulton, Louisville, Victor E. Schwartz, Mark A. Behrens, Rochelle M. Tedesco, Shook, Hardy & Bacon LLP, Washington DC, Hugh F. Young Jr., Product Liability Advisory Council, Reston, VA, William Kennedy Simpson, Thompson, Miller & Simpson, Louisville, for Appellee.

GRAVES, Justice.

I.

In 1973, the United States Federal Food and Drug Administration approved the use and sale of fenfluramine, an appetite suppressing diet medication. The drug was tested, manufactured, and packaged by A.H. Robins and sold by Wyeth–Ayerst Laboratories, under the trade name Pondimin. Appellees, American Home Products Corporation (hereinafter referred to collectively as "AHPC"), of which Wyeth–Ayerst is a division, also marketed another FDA-approved medication for obesity containing fenfluramine, called Redux. Demand for fenfluramine soared during the mid–1990's, when people began using it along with phentermine in a diet drug combination known as "Fen–Phen." The FDA never approved this drug combination.

In response to reports linking fenfluramine consumption to an increased risk of

heart valve regurgitation, and apparently under pressure from the FDA, AHPC withdrew both Pondimin and Redux from the market in September 1997. Since then, many medical studies have confirmed the relationship between fenfluramine use and heart valve abnormalities.

In November 1999, AHPC entered into a "Nationwide Class Action Settlement Agreement" to redress physical injuries of fenfluramine users and provide medical screening to detect health problems arising in others in the future. Appellant, Erma Rae Wood, and many others "opted out" of this settlement because it specifically excluded claims for primary pulmonary hypertension, an often fatal disease stemming from decreased blood flow between the heart and lungs. Appellant seeks relief instead in the immediate suit. She has filed a motion for class certification under CR 23, requesting designation of the suit as a class action with her as the class representative.

Appellant claims to have used the drug fenfluramine from June to December of 1996, and she alleges her exposure to the hazardous substance was the result of AHPC's negligence. In her complaint, Appellant, on behalf of a proposed class, seeks the following relief: (1) court-supervised notice and medical monitoring to enable people who have ingested Fen–Phen to be monitored for the existence of potentially dangerous side effects caused by the drugs, including, but not limited to, valvular heart disease, primary pulmonary hypertension, and for altered serotonin levels and associated cognitive and/or neurophysiological manifestations of impairment or injury; (2) a fund to pay for such monitoring and also medical research concerning the effects of the drugs; (3) reimbursement of the costs of the drugs and/or previously incurred examination costs; and (4) punitive damages. Appellant has advanced various theories of liability as bases for recovery, including negligence, strict liability, concert of action, and enterprise liability.

■ The trial court dismissed Appellant's complaint for failure to state a claim upon which relief can be granted, pursuant to CR 12.02. A motion for dismissal for failure to state a claim should only be granted if it appears the pleading party could not prove any set of facts in support of his claim that would entitle him to relief. *Pari–Mutuel Clerks' Union of Kentucky, Local 541, SEIU, AFL–CIO v. Kentucky Jockey Club*, Ky., 551 S.W.2d 801, 803 (1977). The trial court concluded that Kentucky law requires a plaintiff to prove some present physical injury to support a tort claim, and Appellant had proven no such injury. The Court of Appeals upheld the trial court's decision dismissing the case, also finding that Appellant did not allege in her complaint any "present physical harm as a result of her ingestion of Fen–Phen." Appellant then petitioned this Court for review. There being recent developments in toxic tort litigation in other states, we granted discretionary review to address the important issues raised by Appellant regarding prospective relief for past exposure.

Appellant's complaint specifies as her injury, and that of the class she seeks to represent, "significantly increased risk of serious injury and disease." She further claims that she and others will "probably ... be required to pay sums to ascertain the existence, nature and extent of their injuries in the future." In support of her claim, Appellant cites to many articles from various medical journals in which experts have recommended ongoing diagnostic testing for people who took fenfluramine. Notwithstanding these expert opinions, recovery on a theory of tort, like negligence or strict liability as sought

here, requires a plaintiff to show some present physical injury to support a cause of action. Appellant has offered no proof that she suffers from any injury at the present time resulting from her contact with or ingestion of fenfluramine. As such, Appellant has failed to state a claim upon which relief can be granted and her cause of action has not accrued. We therefore affirm the Court of Appeals in dismissing the complaint.

## II.

■ This Court has consistently held that a cause of action in tort requires a present physical injury to the plaintiff. As early as *Louisville & N.R. Co. v. Roberts*, 207 Ky. 310, 269 S.W. 333, 334 (1925), and again in *Kentucky Traction & Terminal Co. v. Roman's Guardian*, 232 Ky. 285, 23 S.W.2d 272 (1929), our predecessor Court refused to grant recovery for fright without any physical impact to support a cause of action. Later, in *Morgan v. Hightower's Adm'r.*, 291 Ky. 58, 163 S.W.2d 21 (1942), the Court declined to permit recovery for mental distress unaccompanied by physical harm, noting that "In a long and unbroken line of decisions this Court has held that [such] an action will not lie." More recently, the Court has maintained the same position:

> A cause of action does not exist until the conduct causes injury that produces loss or damage. The action for negligence evolved chiefly out of the old common-law form of action on the case, and it has always retained the rule of that action, that proof of damage was an essential part of the plaintiff's case.

*Saylor v. Hall*, Ky., 497 S.W.2d 218, 225 (1973).

■ In addition to her negligence claim, Appellant seeks redress on a theory of strict liability. Just as a negligence claim must be supported by a resulting physical injury, so must a claim based on strict liability. The Kentucky Court of Appeals adopted the view of the Restatement when it held, "To prevail in an action based upon strict products liability, a plaintiff must establish: (1) that there is a 'product,' which . . . (5) results in physical harm to the user or consumer or his property." *Radcliff Homes, Inc. v. Jackson*, Ky.App., 766 S.W.2d 63, 68 (1989) (citing Restatement (Second) of Torts § 402A (1965)). We agree that this is a correct statement of the law.

In recent decades, the issue of present physical injury has intersected with an emerging family of tort cases based on exposure to toxic or otherwise harmful substances. The most significant of these cases, *Capital Holding v. Bailey*, Ky., 873 S.W.2d 187 (1994), analyzed a series of earlier decisions by this Court dealing with the question of whether a tort claim could stand without an injury to support it. Addressing specifically the question of whether mere contact with toxic or harmful substances gives rise to a cause of action in tort, the *Capital Holding* decision remained true to traditional tort law requirements, holding essentially that even where exposure and negligent conduct could be proven, a case must be dismissed if the plaintiff can prove no present physical injury. Because of the similarities between *Capital Holding* and the case before us, we join with the trial court and Court of Appeals in concluding that it is the governing precedent as to the issue at hand.

The facts surrounding *Capital Holding v. Bailey, supra*, are essentially as follows. Plaintiff Bailey had worked removing pipes and ducts which his employer/defendant allegedly knew to contain asbestos. According to Bailey, he went home each day covered in asbestos. Upon learning of his exposure, Bailey sought medical attention. Although his doctor determined, and

eventually testified, that Bailey had an increased risk of developing disease in the future, he found also that Bailey had no present abnormality or manifestation of disease. Because Bailey was suing on traditional tort theories of negligence and outrageous conduct, his cause of action depended on an actual injury. Reaffirming a summary judgment against Bailey, we stated that "until such time as the plaintiff can prove some harmful result from the exposure ... his cause of action has yet to accrue." *Id.* at 195. Thus, this Court concluded that in the absence of any present injury, recovery was not appropriate.

The *Capital Holding* decision based its holding on three previous opinions of this Court: *Louisville Trust Co. v. Johns–Manville Products,* Ky., 580 S.W.2d 497 (1979); *Deutsch v. Shein,* Ky., 597 S.W.2d 141 (1980); and *Davis v. Graviss,* Ky., 672 S.W.2d 928 (1984). Although each of these cases dealt with different factual situations, together they represent the firm legal foundation upon which *Capital Holding* was established, and upon which we now build.

In *Louisville Trust Co. v. Johns–Manville Products, supra,* the plaintiff died from lung cancer as the result of exposure to asbestos. The defendant argued that the lawsuit was time-barred, as the exposure had occurred many years before. Noting that exposure-related diseases often entail long periods of latency, the Court held that the plaintiff could not have been expected to bring suit at the time of exposure because he had no symptoms or knowledge of injury then. Thus, his cause of action arose not with the ingestion of asbestos, but rather with the resulting injury many years later. "A cause of action does not exist until the conduct causes injury that produces loss or damage." 580

S.W.2d at 500 (quoting *Saylor v. Hall,* Ky., 497 S.W.2d 218, 225 (1973)).

In *Deutsch v. Shein, supra,* the Court permitted recovery by a pregnant plaintiff who had been negligently exposed to x-rays by her doctor and chose to undergo an abortion rather than risk an abnormal birth. Although there was no proof that the x-rays were actually harmful, the Court found that the negligence indirectly caused harm to the plaintiff and supported her cause of action. The *Capital Holding* opinion, addressing *Deutsch* in its analysis, noted that *Deutsch*'s significance was the determination that an injury supported a claim regardless of whether that injury was a direct or indirect consequence of the negligent activity: "*Deutsch v. Shein* does not stand for damages for fear in the absence of injury. The abortion and loss of the baby were substantial injury." *Capital Holding, supra,* at 193.

Finally, the *Capital Holding* decision looked to *Davis v. Graviss, supra,* in which the plaintiff sought compensation for increased risk of future harm and mental suffering stemming from head injuries sustained in an automobile accident. There, the Court granted Davis prospective relief because her claims were connected to her original cause of action, which was supported by her serious physical injuries. In *Capital Holding,* we noted,

> The critical difference between *Davis v. Graviss* and the present case is that in *Davis v. Graviss,* as in *Deutsch v. Shein,* the cause of action had already accrued: the plaintiff was suing for future consequences where there was a present injury, not, as here, for the potential consequences of a negligent act where no harmful change was yet made manifest.

*Capital Holding, supra.* Taken together, all of these cases lead to the conclusion that a plaintiff must have sustained some physical injury before a cause of action can

accrue. To find otherwise would force us to stretch the limits of logic and ignore a long line of legal precedent.

## III.

■ Placing the case at bar against the factual and legal backdrop of *Capital Holding,* we find the two very similar and we echo the words of the Court of Appeals:

We cannot distinguish the exposure to asbestos in *Capital Holding* from the exposure to Fen–Phen in this case. In both instances, the plaintiff was exposed to an agent that had the potential to result in serious future medical consequences, but which had not produced actual physical harm at the time of the suit.

Appellant agrees that *Capital Holding* is the governing case, but contends that both the trial court and Court of Appeals misinterpreted the language therein. Specifically, Appellant argues that the present injury requirement established in *Capital Holding* was intended to encompass any harm whatsoever, not merely physical injury or illness. As Appellant concedes that *Capital Holding* is applicable here, and that it correctly states the law regarding a cause of action in tort, our task is limited to determining whether the lower courts correctly interpreted *Capital Holding.* Essentially, this case turns on whether the injury required by *Capital Holding* was intended to be narrowly construed and evidenced by present physical symptoms or illness, or, as Appellant contends, broadly inclusive of any subjective harm, present or anticipated, resulting from a defendant's irresponsible conduct.

As previously mentioned, Appellant did not claim any present physical injury in her complaint. On appeal, Appellant has taken the position that, although she has suffered no demonstrable detriment to her health, she "has indeed suffered a present injury or 'harmful result'" as required by *Capital Holding.* To that end, she maintains that "the current harmful result is the financial expense of the medical monitoring that the Plaintiff has been medically advised to undergo." [1]

Appellant points out that while *Capital Holding* did state that a cause of action is dependent on a present injury, it also noted in various passages that a cause of action accrues with the manifestation of some harm or harmful result. Focusing on the word "harm," Appellant cites to the Restatement in concluding that "'Harm' under the Restatement of Torts 2d means 'the existence of loss or detriment in fact of any kind to a person.'" As Appellant will have to pay significant amounts of money for comprehensive medical screening, she claims that she has suffered a "harmful result" from Appellee's conduct.

Appellant's argument, while creative, is unsupported by either law or logic. As to the law, we believe Appellant's reliance on the Restatement is misplaced. There can be no question but that *Capital Holding* and its predecessors require a physical injury for a cause of action. Appellant implies, as the keystone of her case, that the physical injury requirement can be satisfied by various types of harm, then looks to the Restatement for the above legal definition of "harm." The result is a broad and somewhat vague explanation of the term. Appellant overlooks, however,

---

**1.** The record is void of any reference to specific medical advice or recommendation given to Appellant personally. We assume Appellant is referring to articles from medical journals in which the authors recommend diagnostic testing for any person who ingested fenfluramine for a significant duration of time. We further note that Appellant has not stated in her complaint that she has actually undergone any testing to date.

the more applicable portion of the Restatement, which defines "physical harm" directly. Subsection (e) states, "The words 'physical harm' are used to denote physical impairment of the human body, or of tangible property...." *Restatement (Second) of Torts*, § 7, comment e at p. 14 (1965). As our goal is to determine what constitutes present physical injury as contemplated by *Capital Holding*, we believe this definition is on point and that it excludes Appellant's alleged harm. Appellant's body has not yet been impaired by her ingestion of fenfluramine, and the only tangible property in question is Appellant's money, which likewise has not been expended. Thus, under the Restatement, Appellant's argument does not pass muster.

As to the logic behind Appellant's argument, we reject the same as unsound. All of the terms suggested by Appellant as interchangeable with present injury—loss, detriment, harm—pertain to consequences already realized. In the case at bar, Appellant merely anticipates a future financial expense and speculates as to possible physical injury. This Court is not prepared to part ways with the system of remedies in favor of cash advances as proposed by Appellant.

Furthermore, there is no evidence that the *Capital Holding* decision was intended to be a departure from the very cases it enumerated in support of its decision denying a cause of action absent an underlying physical injury. The cases cited by this Court all required an injury to the body: lung cancer, abortion procedures, and skull fracture. *See Louisville Trust Co. v. Johns–Manville Products, supra; Deutsch v. Shein, supra;* and *Davis v. Graviss, supra.* It would be unrealistic to conclude that we intended to overturn these cases, but did not mention any such intention. Likewise, it defies logic to sup-

pose that the decision would make such a sweeping change to Kentucky tort law without any suggestion that it was so doing.

Perhaps most importantly, *Capital Holding* cannot be interpreted as permitting a cause of action based on any alleged harm whatsoever, while at the same time dismissing the plaintiff's case for lack of such harm. Bailey, the plaintiff in *Capital Holding,* was exposed to asbestos for nearly two years, and went to a doctor who told him that he was at substantial risk of developing serious disease in the future because of his exposure. Here, Appellant ingested fenfluramine for about six months, and cites articles by medical experts suggesting that she is at risk of developing heart valve problems. We find neither a difference between the harms alleged by Bailey and Appellant, respectively, nor a compelling reason to distinguish between them for remedial purposes.

Appellant posits that *Capital Holding* cited only cases involving physical injury because Bailey sought personal injury damages. She reasons that personal injury damages by their very nature (and as the name would indicate) require proof of an injury to one's person; conversely, medical monitoring damages should require only a showing that medical monitoring is necessary, regardless of any physical injury. In response to this argument, we refer to the language of *Capital Holding:* "*No cause of action* accrues until the potentially harmful exposure actually 'causes injury that produces loss or damage.'" 873 S.W.2d at 192 (Emphasis added). With no injury there can be no cause of action, and with no cause of action there can be no recovery. It is not the remedy that supports the cause of action, but rather the cause of action that supports a remedy. Consequently, had Bailey sought medical monitoring damages instead of

personal injury damages, he would have been denied that remedy as well.

To interpret *Capital Holding* as authorizing a cause of action where a person is harmed in any manner not only undermines the obvious intent of the Court, but also produces an absurd result. Without an actual injury requirement, any subjective harm suffered by any person could give rise to tort liability. In the arena of toxic or harmful substances, any exposure might result in litigation, supported only by speculative fears of future injury and costs. We can only construe *Capital Holding* as standing for the continued requirement of a present physical injury as a precursor to a cause of action for negligent exposure to a potentially dangerous substance, and we hold today that this rule still prevails.

Having suffered no actual loss or detriment, nor any harm in the legal sense, Appellant can prove at most that she ingested fenfluramine, a potentially toxic substance. The Court could not have stated its position more lucidly than it did in the following passage: "mere ingestion of a toxic substance does not constitute sufficient physical harm upon which to base a claim for damages." *Capital Holding, supra*, at 195. As Appellant has sustained no present physical injury, her claim cannot stand under existing Kentucky tort law.

## IV.

We are aware that other states have allowed recovery for exposure to harmful substances on a theory known as "medical monitoring," which often does not require a showing of physical injury. Under this theory, a defendant is required to pay a plaintiff for the anticipated costs of checkups and procedures aimed at detection and early treatment of any disease that may arise in the future as a result of tortious exposure.

We also recognize that the case at bar presents an opportunity for Kentucky to join those jurisdictions that have allowed medical monitoring claims in some form. Because the issue is the subject of increasing nationwide debate, and because the issue relates closely to our discussion of present injury, we will attempt to clarify this Court's position regarding such prospective relief.

In her reply brief, Appellant clearly states, "In the case at bar, Plaintiff is certainly not requesting this Court to create a new 'medical monitoring' cause of action." Rather, she indicates that she seeks only medical monitoring damages as part of her remedy in the underlying tort action. This Court has always allowed recognition of future medical damages as a remedy in an action for injuries resulting from negligence. Where a cause of action supports compensation for future expenses, we have long held that such a prospective remedy is available. *See Davis v. Graviss, supra. Oppenheimer v. Smith*, Ky., 512 S.W.2d 510 (1974). Where there has been a physical injury requiring future medical treatment, medical monitoring damages may be a novel way of describing a remedy already employed in this jurisdiction.

Courts in some states, however, are venturing into uncharted territory as they create medical monitoring causes of action and make available medical monitoring remedies that do not require a showing of present physical injury. In these states, the costs of diagnostic testing can be recovered before they are actually incurred on a mere showing of exposure coupled with increased risk of injury. In the name of sound policy, we decline to depart from well-settled principles of tort law.

We are supported in rejecting prospective medical monitoring claims (in the absence of present injury) by both the United States Supreme Court and a persuasive cadre of authors from academia. These authorities explain that, while well-intentioned, courts allowing recovery for increased risk and medical screening may be creating significant public policy problems. The U.S. Supreme Court in *Metro–North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 440, 117 S.Ct. 2113, 2122, 138 L.Ed.2d 560 (1997), addressed the question of "whether the negligent causation of this kind of harm (*i.e.* causing a plaintiff, through negligent exposure to a toxic substance, to incur medical monitoring costs) by itself constitutes a sufficient basis for a tort recovery." Although *Metro–North* had to do with a federal worker's compensation statute, the Court was clearly speaking to the more general issue of medical monitoring when it pointed out that

> tens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring. . . . And that fact, along with uncertainty as to the amount of liability, could threaten both a "flood" of less important cases (potentially absorbing resources better left available to those more seriously harmed) and the systemic harms that can accompany "unlimited and unpredictable liability." (Citations omitted)

*Id.* at 442, 117 S.Ct. at 2123.

Other scholars have made similarly convincing arguments against medical monitoring causes of action or damages in the absence of present injury or illness. In the article by James A. Henderson, Jr., and Aaron D. Twerski, "Asbestos Litigation Gone Mad: Exposure–Based Recovery for Increased Risk, Mental Distress, and Medical Monitoring," 53 S.C. L.Rev. 815 (2002), Henderson and Twerski admit there are some potential benefits from medical monitoring remedies. The authors specifically suggest four such benefits: (1) allowing recovery fosters access to medical testing and facilitates early diagnosis and treatment; (2) recognizing such claims deters irresponsible distribution of toxic substance; (3) early monitoring may prevent future costs and reduce the potential liability of the tortfeasor; and (4) it satisfies basic notions of fairness by assuring that wrongfully exposed plaintiffs recover the costs of medical treatment. *Id.* at 842–843.

Weighing these benefits against the potentially negative effects of medical monitoring remedies, however, the authors conclude that more convincing public policy arguments support the rejection of such claims. For example, courts will inevitably run into problems in determining how to distribute medical monitoring awards. Lump-sum awards might not actually be used for medical costs, especially if a recipient has insurance that will cover such expenses. *Id.* at 844. Monitoring funds to be used by large numbers of people, as the one sought by Appellant in the present case, requires court administration and does not guarantee that potential victims actually get tested. *Id.* These remedies are economically inefficient, and are of questionable long term public benefit. Furthermore, defendants do not have an endless supply of financial resources. Spending large amounts of money to satisfy medical monitoring judgments, will impair their ability to fully compensate victims who emerge years later with actual injuries that require immediate attention.

Another shortcoming of medical monitoring is that, as the Supreme Court alluded to in *Metro–North, supra,* it is simply too far-reaching. Henderson and Twerski write, "Given that negligently distributed

or discharged toxins can be perceived to lie around every corner in the modern industrialized world, and their effects on risk levels are at best speculative, the potential tort claims involved are inherently limitless and endless." Henderson and Twerski, *supra*, at 831. Other problems facing medical monitoring include vague parameters for its application, and inconsistent "triggers," or prerequisites to a claim, from jurisdiction to jurisdiction.

The major argument against medical monitoring discussed in another article, by Victor E. Schwartz et al., "Medical Monitoring—Should Tort Law Say Yes?" 34 Wake Forest L.Rev. 1057 (1999), is that such a remedy is best left to the legislatures. Of the many reasons proffered in the article as to why courts should refrain from stepping into lawmakers' shoes, the most convincing are as follows: first, legislatures are in a better position than courts to acquire all of the relevant information in making such a complex and sweeping change to traditional tort law; second, legislatures' prospective treatment of medical monitoring awards would provide fair notice to potential tortfeasors; and third, claims involving collateral compensation demand careful consideration from the legislature. *Id.* at 1071–1081. These authors also point out that medical monitoring claims will potentially clog the courts as contingency fee lawyers use consumers as vehicles for enormous awards; furthermore, money awarded for the purpose of health care will go in large percentage to those same lawyers, not the exposure victims. *Id.*

Yet another obvious impasse for medical monitoring remedies granted in the absence of present injury is the issue of claim preclusion. "Under the doctrine of *res judicata* or 'claim preclusion,' a judgment on the merits in a prior suit involving the same parties or their privies bars a subsequent suit based upon the same cause of action." *City of Louisville v. Louisville Professional Firefighters Ass'n, Local Union No. 345, IAFF, AFL–CIO By and Through Gnagie,* Ky., 813 S.W.2d 804, 806 (1991). Thus, failure to recognize a cause of action in the absence of an injury is essentially a safeguard that benefits victims. If Appellant were permitted to go forward with her negligence claim, for example, she may very well collect a sum of money commensurate with the medical testing costs that await her. If, however, she were to develop an injury or illness later from the exposure, she may be unable to bring another negligence claim for additional damages. As explained in *Capital Holding, supra,* and the same applies here, "The effect·of this order is to preserve plaintiffs' rights to further pursue tort litigation if and when a 'disease related to the ... exposure' should manifest itself." 873 S.W.2d at 189.

That a plaintiff may bring only one claim for a given cause of action was recently confirmed by this Court in *Carroll v. Owens–Corning Fiberglas Corp.,* Ky., 37 S.W.3d 699 (2000), a case involving exposure to asbestos. ·Although *Carroll* differs from the case at bar in that the plaintiff's cause of action had indisputably accrued, it applies here inasmuch as it demonstrates the practical application of the claim preclusion rule discussed above. In *Carroll,* the plaintiff had elected not to sue when he learned he had contracted asbestosis, a relatively mild illness. Eventually, however, the plaintiff contracted cancer as a result of his exposure, and his widow brought a claim on his behalf after his death.

Refuting the argument that the plaintiff was obligated to bring his claim upon discovery of asbestosis, the Court pointed out that the plaintiff was perhaps wise not to do so: "Because of the length of time

between the diagnoses of these two diseases, it is possible that an asbestosis suit could have been filed and adjudicated before he ever knew he had cancer, leaving him with no direct remedy for the more serious disease." *Id.* at 702. Similarly, if this Court permitted Appellant to go forward on her claim she would be left with no direct remedy should a more serious disease impair her in the future.

Thus, having weighed the few potential benefits against the many almost-certain problems of medical monitoring, we are convinced that this Court has little reason to allow such a remedy without a showing of present physical injury. Traditional tort law militates against recognition of such claims, and we are not prepared to step into the legislative role and mutate otherwise sound legal principles.

### V.

We are mindful of the predicament in which our decision places Appellant and others in similar situations. Those who have ingested fenfluramine, but in whom no disease is yet manifest, will be forced to either forego medical evaluations or proceed with them at their own cost. Nevertheless, any other outcome would result in inordinate burdens for both the potential victim and the alleged negligent party.

Granting Appellant's request for medical monitoring costs absent a showing of physical injury, would require AHPC to finance diagnostic testing for a large number of past fenfluramine users. If each were actually tested, and the results of the tests showed no physical disease, the negligent party will have paid large sums of money despite having caused no physical injury. If, in contrast, the tests revealed the presence of physical disease resulting from the drug ingestion, a strong argument could be made that the victims are precluded from recovering additional damages because

they have already recovered on the claim of negligence.

Requiring prospective victims to finance their own testing, and when such testing demonstrates the presence of disease, the victims will then be able to prove a physical injury such as will support a cause of action. If negligence is proven, those victims will be able to recover all of the money spent on testing as well as damages for the injury and future expenses. For those who pay for their own testing but never find disease, we regret the economic expense but suggest that they have paid for a service and received the benefit thereof—in this case, a clean bill of health and the accompanying peace of mind.

From a policy standpoint, this outcome should act as a sufficient deterrent to those who would negligently produce and distribute harmful substances, for they shall still have to compensate victims for any injury caused. Likewise, recognizing only claims supported by physical injury will prevent the potential flood of litigation stemming from unsubstantiated or fabricated prospective harms, thereby preserving judicial and corporate resources to compensate actual victims who develop injuries in the future.

### VI.

Because Appellant has shown no present physical injury, her cause of action under theories of negligence and strict liability have yet to accrue. Thus, Appellant's complaint was correctly dismissed for failure to state a claim upon which relief can be granted. For the same reasons, the class action must fail. Where there is no injury, there can be no redress. If and when Appellant manifests an injury resulting from AHPC's conduct, only then will she have a remedy under the law. The

judgment of the Court of Appeals is therefore affirmed.

All concur.