RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0274p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RICHARD GAETANO; KIMBERLY BASEHART GAETANO,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA; MAURICE EADIE; KELLY
A. WILLIAMS,

*Defendants-Appellees*.

┐
│
│
│
> No. 19-1122
│
│
│
┘

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-11839—Bernard A. Friedman, District Judge.

Argued:  October 24, 2019

Decided and Filed:  November 6, 2019

Before:  SUTTON, COOK, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:**  Joseph Falcone, JOSEPH FALCONE, P.C., Southfield, Michigan, for Appellants.
Deborah K. Snyder, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellees.  **ON BRIEF:**  Joseph Falcone, JOSEPH FALCONE, P.C., Southfield, Michigan, for
Appellants.  Deborah K. Snyder, Gretchen M. Wolfinger, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Appellees.

─────────────────

## OPINION

─────────────────

SUTTON, Circuit Judge.  Richard and Kimberly Gaetano trusted Gregory Goodman as
their legal advisor and business partner in running a cannabis operation.  That trust was spurned.

The Gaetanos ended the relationship after ethics violations undid Goodman's license to practice law. He retaliated by assisting the Internal Revenue Service in a tax audit against them. Concerned about what Goodman might reveal, the Gaetanos sued the government to prevent it from discussing attorney-client confidences with him. The Anti-Injunction Act bars the lawsuit, and the *Williams Packing* exception does not apply. *See* 26 U.S.C. § 7421(a); *Enochs v. Williams Packing & Navig. Co.*, 370 U.S. 1 (1962).

I.

Husband and wife Richard and Kimberly Gaetano run 420 Wellness Dispensary. As the name suggests (to some), they sell cannabis. Assisting them in this operation was Gregory Goodman, a lawyer. Trouble began in 2010 when the Gaetanos, with Goodman's help, attempted to transfer shares in their business to another cannabis company, AgraTek. The shares, as it happens, were not theirs to transfer. They had already been purchased by Green-VisionTek, one of AgraTek's rivals.

Green-VisionTek did not react well to the transaction. It sued the Gaetanos, Goodman, and 420 Wellness. And it filed a disciplinary complaint against Goodman for good measure. An ethics inquiry cast an unflattering light on Goodman. He had negotiated future employment with AgraTek while representing 420 Wellness in the purchase agreement. From that point on, he began double-dealing. When the Gaetanos contemplated breaking off their arrangement with AgraTek, for instance, Goodman encouraged them to reconsider. To make matters worse, Goodman reached into the pot of money used to secure the purchase agreement and helped himself to a generous (and unauthorized) attorney's fee. Trying to cover his tracks, he manufactured fake emails that he presented under oath in civil litigation and in the state ethics proceedings.

Goodman lost his license to practice law in June 2014. The Gaetanos apparently did not learn of this fact until that October, when they severed their relationship with him. We don't know the specifics of their parting. But it's fair to infer that it was not amicable.

That brings us to 2017, when the Internal Revenue Service began an audit of the Gaetanos' 2014 and 2015 tax returns. As part of this investigation, it sent a letter to Goodman

asking for assistance.  Goodman saw an opportunity.  He notified the Gaetanos of the IRS's request.  Unless they gave him a "significant down-payment," he threatened, he would "make a final push in the second half of 2017" to see them "take[n] down" and "led away in handcuffs." R. 16-4 at 11.  When they did not oblige, Goodman sent a series of menacing emails, warning them to "get used to being tailed" and assuring them that their lives would "go[] down in flames" unless they paid him his due.  R. 16-4 at 13.  The Gaetanos reached out to the IRS through a new attorney, insisting that it cease contact with Goodman and destroy whatever privileged information he had shared.

The extortion unsuccessful, Goodman made good on his threat to call the IRS. According to the agent who handled the phone call, Goodman "was upfront that he ha[d] an axe to grind with the Gaetanos."  R. 33-3 at 1.  But the agent, who knew of Goodman's history, "cautioned that due to the prior relationship" he had with the Gaetanos she didn't want him to "share any privileged communique with her."  *Id.*  Goodman replied that he would not, that he "understood the difference between privileged and non-privileged communication," and that he obtained his information primarily through "on-line searches and work performed by a Private Investigator."  *Id.*  All the same, the agent told him that she would "run any information he provided to her" by "IRS counsel as well as her Manager" to ensure "confidentiality had not been violated."  *Id.*  Over the next 50 minutes, Goodman proceeded to discuss various aspects of the Gaetanos' drug business.

Goodman followed up this call with an email to Kimberly Gaetano.  In it, he taunted her: "Guess what we talked about for 50 minutes, and how excited [the agent] is?"  R. 12-5 at 2. "You are going down," he warned, alongside "your mother, your stepson, your babysitter, your husband, and anyone else who's helping you out there."  *Id.*  "[I]t sounded like [the agent] was breaking pencil tips by scribbling so fast," he added, before calling Kimberly names no parent would give a child.  *Id.*

Concerned about the email and keen to protect their drug business, the Gaetanos reached out to the IRS.  According to the amended complaint, the IRS stated that it intended to continue interviewing Goodman and that it had "no obligation to refuse to receive what it knew to be

privileged attorney-client communications." R. 16 at 5. The IRS agrees that it spoke with the Gaetanos' counsel but has yet to identify any attorney-client privileged information.

A procedural tango followed. The Gaetanos filed a complaint seeking to stop the government from discussing attorney-client privileged information with Goodman and requiring it to destroy any attorney-client confidences it already had. The IRS moved to dismiss, asserting that the court lacked jurisdiction to hear the Gaetanos' request for equitable relief under the Anti-Injunction Act. *See* 26 U.S.C. § 7421(a). The Gaetanos invoked an exception to the Act that applied because their case, they claimed, was a clear winner on the merits.

The same day they filed their response, the Gaetanos amended their complaint to add a *Bivens* claim seeking damages against several IRS agents for violating their Fifth and Sixth Amendment rights. In view of this amendment, the district court denied the motion to dismiss as moot.

The Gaetanos agreed to dismiss their *Bivens* action. The court obliged. In doing so, it also dismissed on its own initiative their claim for injunctive relief, though no motion to dismiss remained pending. The Gaetanos moved for reconsideration, pressing variations on arguments already raised. The court denied the motion. The Gaetanos appeal.

II.

The Anti-Injunction Act says that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). We have previously described the Act as stripping courts of "jurisdiction" to hear covered lawsuits. *Ecclesiastical Order of the Ism of Am, Inc. v. I.R.S.*, 725 F.2d 398, 402 (6th Cir. 1984). But we have not had occasion since *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006), to determine whether the Act genuinely implicates our subject matter jurisdiction, or whether it instead imposes a mandatory claim-processing rule subject to waiver, forfeiture, and estoppel. *Cf. Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1159 (10th Cir. 2013) (en banc) (Gorsuch, J., concurring); *Morris v. United States*, 540 F. App'x 477, 479–80 (6th Cir. 2013). This is not the case to weigh in on that question, as the Gaetanos do not deny the threshold applicability of the Act. They instead invoke

an exception to the Act recognized by *Williams Packing*, 370 U.S. at 6. To invoke the exception, the taxpayer must show two things: (1) that "under no circumstances could the Government ultimately prevail" against their claims for injunctive relief and (2) that "equity jurisdiction otherwise exists." *Id.*

Starting with the first requirement, the Gaetanos claim they are plainly entitled to injunctive relief for several distinct reasons.

They first claim that the government's intrusion into their attorney-client relationship violated their Sixth Amendment right to counsel. That argument disposes of itself. The Sixth Amendment does not attach until a criminal "prosecution is commenced," *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991), which in turn requires a "formal charge, preliminary hearing, indictment, information, or arraignment," *United States v. Gouveia*, 467 U.S. 180, 189 (1984); *see Rothgery v. Gillespie County*, 554 U.S. 191, 200–03 (2008). The government's inquiry in this instance remains investigatory, and no criminal prosecution has begun. Because the Sixth Amendment does not "protect[] the integrity of the attorney-client relationship" before "the prosecution has in fact commenced," *Moran v. Burbine*, 475 U.S. 412, 428–29 (1986), the Gaetanos have no Sixth Amendment basis for obtaining relief.

The Gaetanos next seek refuge in the Due Process Clause of the Fifth Amendment. As a "creation of the common law, not the Constitution," the attorney-client privilege cannot by itself provide the basis for a due process claim. *Sanborn v. Parker*, 629 F.3d 554, 575 (6th Cir. 2010) (quoting *Lange v. Young*, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989)); *see Maness v. Meyers*, 419 U.S. 449, 466 n.15 (1975). Support for the Gaetanos' position thus must come from somewhere else, in this instance from cases holding that deliberate "preindictment intrusion[s]" into the attorney-client relationship may prove "so pervasive and prejudicial" as to imperil the fairness of subsequent proceedings. *United States v. Voigt*, 89 F.3d 1050, 1066 (3d Cir. 1996).

But these cases do not help them either. Vanishingly few decisions have found a due process violation for government intrusion into the attorney client relationship. *See, e.g.*, *United States v. Schell*, 775 F.2d 559, 565 (4th Cir. 1985); *United States v. Marshank*, 777 F. Supp. 1507, 1519 (N.D. Cal. 1991). The few cases generally involved nefarious government conduct,

such as infiltrating a defense lawyer's office. *See United States v. Stringer*, 535 F.3d 929, 941–42 (9th Cir. 2008). And in the lion's share of cases, courts treat these due process claims with suspicion. *See, e.g.*, *United States v. Hoffecker*, 530 F.3d 137, 153–54 (3d Cir. 2008); *United States v. White*, 970 F.2d 328, 333–37 (7th Cir. 1989). For our part, we have never found a Fifth Amendment violation on this ground. And we recently expressed our skepticism about the continued vitality of the "outrageous government conduct" defense, *see United States v. Harney*, 934 F.3d 502, 506–07 (6th Cir. 2019), of which these claims are thought to be a subspecies, *see, e.g.*, *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000), *amended on denial of reh'g* (Aug. 15, 2000).

Even if this deliberate-intrusion concept could form the basis of a due process claim, the Gaetanos still would not prevail. Such claims require an "ongoing, personal attorney-client relationship." *Voigt*, 89 F.3d at 1067. That's not something the Gaetanos and Goodman have. Such claims also require a "deliberate intrusion." *Id.* But that's not what happened. The government never requested privileged information from Goodman. Such claims also require "actual and substantial prejudice." *Id.* But the Gaetanos seek relief outside the context of any enforcement proceeding, and they offer no explanation why the ordinary remedy—suppressing privileged evidence—would fail to protect them. *See Haynes*, 216 F.3d at 796–97. No Fifth Amendment danger lurks.

The Gaetanos raise other grounds for relief. As one potential source of relief, they point to 26 U.S.C. § 7525. But it states only that communications between tax preparers and their clients can be privileged. That doesn't remotely justify the remedy they request.

The Gaetanos add that federal courts have common law power to enjoin intrusions into the attorney-client relationship. In some settings, yes. But not here. Sure: The privilege can be raised by lawyers and their clients as a shield against compelled disclosure of protected information, *see In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009); it can be invoked to quash subpoenas, *see In re Grand Jury Subpoenas*, 454 F.3d 511, 512–13 (6th Cir. 2006); and it can supply the basis for protective orders, *see* Fed. R. Civ. P. 26; *see, e.g.*, *Rainer v. Union Carbide Corp.*, 402 F.3d 608, 625 (6th Cir. 2005), *opinion amended on reh'g* (Mar. 25, 2005). But the privilege cannot be used to stop extrajudicial communications unrelated to

proceedings before a court. Judges have no "roving commission to police voluntary, out-of-court communications." *Wharton v. Calderon*, 127 F.3d 1201, 1205 (9th Cir. 1997). A court's "authority to 'protect' the attorney-client privilege" doesn't apply to such communications "any more than it does to an after-dinner conversation." *Id.* at 1205–06; *accord Bittaker v. Woodford*, 331 F.3d 715, 731–32 (9th Cir. 2003) (en banc) (O'Scannlain, J., concurring in the judgment).

Perhaps most importantly, we are not aware of any case using any such theory to shoehorn into the *Williams Packing* exception. Keep in mind that, so far as the record shows, the government has not done anything wrong. And keep in mind the threshold for impropriety. In *United States v. Rogers*, an IRS agent interviewed a criminal defendant's former tax lawyer and induced him to divulge privileged material. 751 F.2d 1074, 1075 & n.1 (9th Cir. 1985). Even though that lawyer "failed to assert [his] ethical obligation" to confidentiality, the court found no misconduct because the agents did not employ "subterfuge to deprive [the lawyer] of the opportunity to decline to answer," and because the lawyer "could have conveyed information to [the agents] that was not violative of his ethical duty of confidentiality." *Id.* at 1080. Other courts have reached the same conclusion on similar facts. *See, e.g.*, *United States v. Tyerman*, 701 F.3d 552, 558–60 (8th Cir. 2012); *Stringer*, 535 F.3d at 941–42.

This case is much farther from the line. The government counseled Goodman *not to* divulge privileged material, verified that he understood the difference between privileged and non-privileged material, and took steps to clear communications with legal counsel. To this day, the Gaetanos have not identified any privileged information in the three-page summary of the agent's call with Goodman.

It does not change our view that the district court dismissed the Gaetanos' claim for injunctive relief of its own accord, without giving the Gaetanos a chance to respond. To be sure, it erred in doing so. But not every procedural misstep results in a reversal. To warrant a do-over, the Gaetanos need to show that the court's mistake prejudiced them in some way. *See Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). They make no such showing. The Gaetanos already once amended their complaint in response to the government's answer. They had a chance to ventilate all their claims and knew that they needed to identify plausible allegations entitling them to

relief. *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 931 (6th Cir. 2000). Because the Gaetanos still lack any circumstances under which they can prevail, no prejudice arose from the district court's decision. *See Williams Packing*, 370 U.S. at 6.

The Gaetanos also fail to establish the second prerequisite for relief under the *Williams Packing* exception: eligibility for equitable relief. The tripping point is that they have not shown an inadequate remedy at law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The first, the most obvious, option is that the Gaetanos may invoke the privilege if the government uses privileged information against them in a criminal proceeding. *See United States v. Warshak*, 631 F.3d 266, 292–95 (6th Cir. 2010). That is the conventional route for protecting such confidences. *See Haynes*, 215 F.3d at 796–97; *United States v. Sander*, 615 F.2d 215, 219 (5th Cir. 1980). Other avenues of relief remain available to the Gaetanos. When a lawyer turn-coats against clients, the clients may seek professional sanctions, a reality Goodman knows firsthand. If they suffer injury, they may be able to bring civil claims under state law. And for conduct beyond the pale, criminal charges remain available. It's not for us to speculate how the Gaetanos may fare should they take one of these approaches. What matters is that they request only injunctive relief against the government's tax investigation, and that is not something we can provide them under these circumstances.

We therefore vacate the district court's order and remand the case to the district court to dismiss for lack of jurisdiction.