NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0577n.06
Filed: August 11, 2006

No. 05-5788

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ART K. EDWARDS, JAMES H. CHESNUT, VELVA YEOMANS, CHUCK HOBBS, B. J. BOND, TOM EMERSON, HARRY P. COLBERT, C. R. BEVERLY, BILL D. PENRY, TYRONE T. SIVELS, BILL LINDSEY, and CARL W. WALTER, | ) ) ) ) ) ) | |
| | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF ENERGY, LOCKHEED MARTIN ENERGY SYSTEMS, INC., and UNITED STATES ENRICHMENT CORPORATION, | ) ) ) ) ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: BATCHELDER and GRIFFIN, Circuit Judges; and ZATKOFF, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiffs Art K. Edwards, James H. Chesnut, Velva Yeomans, Chuck Hobbs, B. J. Bond, Tom Emerson, Harry P. Colbert, C. R. Beverly, Bill D. Penry, Tyrone T. Sivels, Bill Lindsey, and Carl W. Walter (collectively hereinafter "Edwards") appeal the district court's dismissal of their claims against defendants United States Department of Energy ("DOE"), Lockheed Martin Energy Systems, Inc. ("LMES"), and United States Enrichment Corporation ("USEC"). Edwards contends

_____

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

that the district court erred in (1) finding that the doctrine of sovereign immunity precluded their claims against DOE, and (2) holding that the federal "catch-all" statute of limitations barred the balance of their claims against LMES and DOE. For the following reasons, we affirm the district court's judgment.

I.

A.      *Background.*

Plaintiffs are a class of retirees from the Paducah Gas Diffusion Plant ("PGDP") who were "participants" in the pension plans created for PGDP employees. The PGDP is an 1,800 employee uranium enrichment facility built by the federal government in the early 1950s and, for some time, was operated by various private contractors on behalf of DOE, including Lockheed Martin Utilities Services. *Rainer v. Union Carbide Corp.*, 402 F.3d 608, 611 (6th Cir.), *cert. denied*, – U.S. – , 126 S. Ct. 562 (2005). In part, because of its management by a government agency,[1] S. REP. NO. 104-173, at § 18 (1995), the United States' uranium enrichment program began to suffer and, as a result, Congress created USEC, a government corporation, as part of the Energy Policy Act of 1992, H.R. 776, 102nd Cong. § 901 (1992) (enacted). Although the statute established USEC as a governmental entity, *id*. §§ 1301(b) & (c), it simultaneously set forth a strategic plan for privatization, *id*. § 1501.

---

[1]As the government notes, one consequence of PGDP being managed by a government agency was, for example, the requirement that DOE publish certain commercially sensitive materials in the Federal Register. A private company, however, would have treated such information as proprietary and, as a result, would not have been required to issue it for publication. S. REP. NO. 104-173, at § 18 (1995).

While USEC remained a "wholly owned Government corporation," *id*. § 1301(b), it employed private contractors to operate enrichment plans, including PGDP, *Rainer*, 402 F.3d at 611.

Although the Energy Policy Act optimistically called for privatization within two years of its enactment, H.R. 776, § 1501(a), potential investors were skeptical because it remained unclear what liabilities a potential buyer would be asked to assume, S. REP. NO. 104-173, at § 18 (1995). Accordingly, Congress enacted the USEC Privatization Act in 1996 (hereinafter "the Act") to clarify the manner and means by which USEC would be privatized. Omnibus Consolidated Recessions & Appropriations Act of 1996, H.R. 3019, 104th Cong. §§ 3107-17 (1996). In doing so, the Act ordered the directors to "establish a private for-profit corporation under the laws of a State for the purpose of receiving the assets and obligations of the Corporation at privatization and continuing the business operations of the Corporation following privatization." 42 U.S.C. § 2297h-3(a)(1). The private corporation would thereafter be responsible solely for "any liabilities arising out of its operations after the privatization date." *Id*. § 2297h-7(c). The Act makes clear that the private corporation "shall not be an agency, instrumentality, or establishment of the United States, a Government corporation, or a Government-controlled corporation." *Id*. § 2297h-3(b)(1). Correspondingly, the Act expressly withdrew the United States' consent to suit on any claim related to the privatization of USEC. *Id*. § 2297h-7(a)(4).

Pursuant to the foregoing, the privatization process was completed on July 28, 1998, thereby creating the private corporation known as USEC. United States Enrichment Corporation, 63 Fed. Reg. 42,201 (Aug. 7, 1998) (codified at 10 C.F.R. pt. 1101). Assuming that the newly formed USEC

elected to terminate or change the contractor for current/retired employee pension plans, the Act required USEC to "arrange for the transfer of all plan assets and liabilities relating to accrued pension benefits of such plan's participants and beneficiaries from such plant to a pension plan sponsored by the new contractor . . . ." 42 U.S.C. § 2297h-8(a)(2).

At the time of privatization, Lockheed Martin Utility Systems, Inc. ("LMUS") served as the operating contractor of PGDP, and LMUS employees participated in a pension plan maintained by defendant LMES. In May 1999, although USEC terminated LMUS as operating contractor of PGDP, roughly 4,000 LMUS employees remained at PGDP and simply became employees of USEC. In accordance with the Act, USEC then effectuated the transfer of more than $548 million worth of pension assets via agreement between LMES and USEC on May 24, 2000 ("the new plan"). At the time of the agreement, a surplus of funds existed in the LMES pension plan beyond the sum necessary to cover the vested benefits of plan participants. Significantly, only PGDP workers were affected by the pension asset transfer agreement between LMES and USEC; employees and retirees from enrichment plans other than PGDP continued to be covered under the previous pension plan ("the old plan").

Four years later, the sponsor of the old plan increased pension benefits for remaining plan participants, including employees of other enrichment plants. That same year, the USEC pension plan denied an increase in benefits to PGDP employees and retirees.

B.      *The instant action*.

Plaintiffs in this case are a putative class comprised of PGDP retirees who, prior to the pension asset transfer, were participants in the LMES-administered pension plan. Consistent with the above, plaintiffs became participants in the USEC plan after the completion of the asset transfer. Apparently dissatisfied with their pension benefits, plaintiffs commenced this action on June 29, 2004, against LMES, USEC, and DOE, alleging violations of the Privatization Act and the breach of various fiduciary duties under the Employee Retirement Income Security Act ("ERISA").[2] The totality of plaintiffs' claims arise from their central contention that defendants failed to transfer a pro rata share of the surplus associated with the LMES pension plan into the USEC plan.

Both DOE and LMES subsequently moved to dismiss the complaint or, alternatively, to grant summary judgment. Similarly, USEC moved the court to grant a judgment on the pleadings or, in the alternative, to grant summary judgment. On April 13, 2005, the district court dismissed plaintiffs' claims. *Edwards v. United States Dep't of Energy*, 371 F. Supp. 2d 859 (W.D. Ky. 2005). First, the court concluded that the sovereign immunity doctrine precluded plaintiffs' claims against DOE. Second, the court likewise dismissed plaintiffs' claims against LMES and USEC, concluding that (1) plaintiffs' § 1983 claims must fail because neither LMES nor USEC is a "state actor," and (2) plaintiffs' Privatization Act and ERISA claims were time-barred.

---

[2]Specifically, plaintiffs asserted four counts against each of the three defendants. First, plaintiffs claimed that defendants deprived them of equal protection pursuant to the Fourteenth Amendment because plaintiffs were arbitrarily burdened by the award of an increase in benefits exclusively to participants in the old plan. Second, plaintiffs asserted that defendants violated the terms of the Privatization Act. Third, plaintiffs alleged that defendants breached fiduciary duties imposed on them by ERISA. Finally, plaintiffs asserted civil-rights claims pursuant to 42 U.S.C. § 1983.

In concluding that plaintiffs' Privatization Act claims were time-barred, the district court

applied 28 U.S.C. § 1658, the federal "catch-all" four-year statute of limitations that governs

statutory remedies created after December 1, 1990. Applying that tolling period, the district court

found that plaintiffs either knew or had reason to know of their injury on May 24, 2000, the date of

the Pension Plan Transfer Agreement. Although plaintiffs claimed that the statute of limitations did

not begin to run until June 30, 2004, designated the "final transfer date" by the terms of the Pension

Plan Asset Transfer Agreement, the district court disagreed and stated as follows:

> Plaintiffs' contention that their claim accrued on June 30, 2000 is not consistent with
> Sixth Circuit case law which focuses on the date of an event which should have
> alerted the typical lay person to protect his or her rights. *See e.g., Roberson v.
> Tennessee*, 399 F.3d 792, 2005 WL 350946 (6th Cir. 2005). The Plaintiffs' decision
> to wait until the date of the final installment prior to filing suit is identical to the
> decision of the medical student in *Roberson*, who decided to wait out the appeals
> process rather than filing a civil rights suit at the point at which a reasonable person
> would have acted to protect his or her rights. *Id*. at *2, *4.

This timely appeal followed.

II.

We conduct a de novo review of a district court's decision to grant motions seeking either

dismissal, summary judgment, *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th

Cir. 2002), or judgment on the pleadings, *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension

Corp.*, 399 F.3d 692, 697 (6th Cir. 2005). Summary judgment is appropriate when there are no

issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). A complaint is properly dismissed for failure to state a claim when "it is clear

that no relief could be granted under any set of facts that could be proved consistent with the

allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Although we must view the complaint in the light most favorable to plaintiffs and accept well-pled facts as true, we need not accept legal conclusions as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Thus, pure questions of law are subject to de novo review. *S.J. v. Hamilton County*, 374 F.3d 416, 418 (6th Cir. 2004) ("[This Court] review[s] de novo the legal question of whether [a litigant] is entitled to sovereign immunity, but accept[s] any pertinent factual findings by the district court unless they are clearly erroneous." (citations omitted)).

III.

Plaintiffs first contend that the district court incorrectly concluded that the federal "catch-all" statute of limitations operates to bar their Privatization Act claims against LMES and USEC. Specifically, plaintiffs renew their argument that the statute of limitations did not begin to run prior to June 30, 2000, and, additionally, "[t]here is simply nothing in the record as to when the Appellants learned of the contents of the 'Pension Asset Transfer Agreement' or even its existence." Even if they possessed the Agreement, plaintiffs assert that "[t]o conclude that the Appellants claim began accruing on the date of a pro[f]essionally written private agreement with technical references to which the Appellants were not a party is unfair and not consistent with the law as has been applied in this Court." Indeed, plaintiffs state, the focus should be on whether plaintiffs received notice of the pension asset transfer in layman's terms; i.e., notice stating affirmatively and unambiguously that the surplus fund would not be transferred in the transfer agreement. Given that

they did not receive such notice, plaintiffs conclude that reversing the district court's grant of summary judgment against LMES and USEC is appropriate.

At the outset, a question exists as to what statute provides the applicable limitations period. The district court accurately observed that the employee protection provisions of the Privatization Act do not include a statute of limitations. *See* 42 U.S.C. § 2297h-8. Noting the absence of a specific limitations period in the Privatization Act, the district court applied the so-called "catch-all" provision found in 28 U.S.C. § 1658. In pertinent part, that statute provides:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990] may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C. § 1658(a). As the Supreme Court observed, "[a] cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 – and therefore is governed by § 1658's 4-year statute of limitations – if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Given that the Privatization Act was enacted in 1996, and therefore after 1990, the district court properly applied § 1658.

The question therefore becomes whether plaintiffs commenced the instant action within the applicable four-year statute of limitations. A statute of limitations begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). "Courts have taken a

common-sense approach to this task, inquiring as 'to what event should have alerted the typical lay person to protect his or her rights.'" *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005) (quoting *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000)).

In this case, USEC argues, and the district court agreed, that plaintiffs had notice of the Privatization Act claims as early as April 26, 1999, when Congress enacted the Act. Specifically, USEC relies on the language of the Act warning of the "transfer of all plan assets and liabilities related to accrued pension benefits." 42 U.S.C. § 2297h-8(a)(2). Highlighting the plain language of the Act is indeed appropriate; it does not provide for a transfer of surplus assets from the original plan to the new plan. Alongside this argument, plaintiffs confusingly concede that "[a]ll parties had constructive and actual notice of the USEC Privatization Act and its legislative history which created the impression and obligation that LMES would be transferring 'any surplus funds' with the transfer of the Appellants to the USEC Pension Fund."

Assuming that the Act itself failed to provide the requisite notice, USEC highlights a written notice sent to plaintiffs on May 12, 1999, indicating that LMUS would no longer exist and PGDP employees would become employees of USEC on May 18, 1999. The notice likewise noted that, as a result of that transition, "USEC will provide your pension plan benefits." The notice further explained varied points about the forthcoming transition and invited employees to ask questions by calling a provided phone number or, alternatively, attending information sessions "for those retirees who would like local HR representatives to address questions or concerns in a face-to-face setting." Plaintiffs could undoubtedly have asked questions via phone or at an information session and then

subsequently filed a complaint if they learned that the so-called "surplus assets" would not be transferred to their new pension plan.

Even assuming the foregoing was insufficient to provide plaintiffs with notice of their possible cause of action, USEC highlights a plan amendment effective as of May 18, 1999.[3]  A pertinent portion of the transfer amendment labeled "Transfer to the United States Enrichment Corporation Defined Benefit Plan" provides as follows:

> At the direction of the Committee and upon the assumption of such accrued benefit liabilities by the USEC Plan, the Insurance Company and/or Trustee shall transfer to the funding vehicle established for the USEC Plan, assets in cash or in kind equal in value to the then Accrued Benefit of each transferred LMUS Participant . . . . Except as provided herein, or in the Pension Transfer Agreement between USEC and the Company, or at the direction of the United States Department of Energy, *no other assets or liabilities shall be transferred to the USEC Plan from the [old] Plan.*[4]

(Emphasis added.)  Finally, the district court highlighted the May 24, 2000, Pension Plan Asset Transfer Agreement itself, which formalized the agreement between USEC and LMES to commence an initial asset transfer of approximately $400 million on or about July 1, 1999.

---

[3]USEC suggests that the Amendment became effective on December 21, 1999.  That date is, however, the date the Amendment was signed.  The Amendment itself reflects that it "shall be effective as of the dates set forth herein."  The specific provision governing "Transfer" states that it "is hereby amended effective as of May 18, 1999[.]"

[4]Plaintiffs thematically suggest that language like that contained in the May 18 transfer amendment is beyond the purview of "laymen."  Plaintiffs likewise suggest that there is no evidence in the record to indicate that they were provided with this language.  Perhaps if this were the sole ground upon which the district court ruled, plaintiffs' arguments would be well-taken.  Reference to the May 18 transfer amendment, however, is hardly the sole opportunity plaintiffs had to learn about the pension asset transfer agreement.  Instead, the amendment merely provides further evidence that, following a reasonably diligent investigation, plaintiffs could have inquired into whether the "surplus assets" would be transferred to the new plan.

Taken together, the foregoing events undoubtedly provided plaintiffs with the requisite notice necessary to discover the existence of their cause of action through the exercise of reasonable diligence. As the district court aptly noted, "[i]t should have been clear to the Plaintiffs that they may have had a possible cause of action long before but in any event no later than May 24, 2000, the date of the Pension Plan Agreement." Accordingly, plaintiffs' June 29, 2004, complaint was untimely filed.

IV.

Plaintiffs next renew their contention that the sovereign immunity doctrine does not preclude their claims against DOE. Plaintiffs specifically argue that the language of 42 U.S.C. § 2297h-8(a)(7)(C) provides them with a cause of action.[5]

The United States is protected from suit by sovereign immunity absent a waiver, *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994), *and* "a claim falling within the terms of the waiver," *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citations omitted). Significantly, the requisite waiver "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969) (citing *United States v. Sherwood*, 312 U.S. 584 (1941)). Moreover, even in the presence of a valid waiver, the "'limitations and conditions upon

---

[5]As noted above, plaintiffs mention that a waiver of sovereign immunity applies because "DOE is a required party to enforce the provisions of the USEC Privatization Act." To the extent that this sentence renews their argument below that FED. R. CIV. P. 19(b) applies to this case and renders the United States an "indispensable party," it, too, fails. *California v. Arizona*, 440 U.S. 59, 63 (1979) (concluding that if the United States is an indispensable party pursuant to Rule 19, but that it has not waived sovereign immunity, then "[t]he suit . . . could not be maintained in any court").

which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.'" *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)).

In this case, plaintiffs renew their contention that 42 U.S.C. § 2297h-8(a)(7)(C) provides an express waiver of sovereign immunity:

> Any suit alleging a violation of any provision of this subsection, to the extent it does not allege a violation of the National Labor Relations Act, may be brought in any district court of the United States having jurisdiction over the parties, without regard to the amount in controversy or the citizenship of the parties.

*Id.*

The question therefore becomes whether § 2297h-8's statutory grant of subject-matter jurisdiction likewise qualifies as a waiver of sovereign immunity. As the district court observed, and the government argues, the mere fact that a federal court has jurisdiction to entertain a cause of action does not correspondingly mean that the United States has waived its immunity from being sued on that same cause of action. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37-38 (1992); *see, e.g., Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786 n.4 (1991) ("The fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim."); *United States v. Certain Land Situated in the City of Detroit*, 361 F.3d 305, 307 (6th Cir. 2004) (concluding 28 U.S.C. § 1367(a), the supplemental-jurisdiction statute, "does not constitute a waiver of sovereign immunity"), *cert. denied*, 543 U.S. 1120 (2005); *Reed v. Reno*, 146 F.3d 392, 398 (6th Cir. 1998) ("Section 1331's general grant of federal question jurisdiction, however, does not by its own terms waive sovereign immunity and vest in district courts plenary

jurisdiction over claims for money judgments against the United States.") (internal citation and quotation marks omitted).

More importantly, upon its enactment, the Privatization Act expressly withdrew the government's consent to be sued:

> Any stated or implied consent for the United States, or any agent or officer of the United States, to be sued by any person for any legal, equitable, or other relief with respect to any claim arising from any action taken by any agent or officer of the United States in connection with the privatization of the Corporation is hereby withdrawn.

42 U.S.C. § 2297h-7(a)(4). As the Supreme Court has observed, "the power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations." *Maricopa County v. Valley Nat'l Bank*, 318 U.S. 357, 362 (1943) (citing *Lynch v. United States*, 292 U.S. 571, 581 (1934) (noting "Congress retained power to withdraw the consent at any time" and "consent to sue the United States is a privilege")). The district court therefore correctly concluded that DOE has not waived its sovereign immunity and, as a result, plaintiffs' action against DOE cannot be maintained.

Affirmed.

ALICE M. BATCHELDER, Circuit Judge. I concur in the result and most of the reasoning of the majority opinion but write separately to express my view that passage by Congress of the Privatization Act in 1996 could not have given the plaintiffs reason to know of a claim arising from a transfer that occurred over four years later on May 24, 2000. In addition, the May 12, 1999, letter from LMUS to the plaintiffs, although relied upon by the district court, also gave the plaintiffs no reason to know of their claim. Although the letter described the level of benefits under the new plan, it did not describe the transfer of assets, surplus or otherwise. It therefore could not have alerted the plaintiffs to the possibility that LMUS would not transfer a portion of the surplus assets to the USEC plan.

I nonetheless agree with the majority and the district court that later events should have alerted the plaintiffs to the need to protect their rights. *See Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). The full details of the transfer from the LMUS plan to the USEC plan were described in the LMUS plan amendment of December 21, 1999, and the Pension Plan Transfer Agreement of May 24, 2000. Together, these documents specified that no assets other than "accrued benefits" would be transferred to the new plan and that the transfer would comply with Internal Revenue Code § 414(l), which, among other things, governs disposition of excess assets in the spin-off of a defined benefit plan. *See* 26 U.S.C. § 414(l)(2). These provisions, when read jointly, should have put the plaintiffs on notice of the need to inquire into the propriety of the transfer described by the plan amendment. Because the plaintiffs could have discovered their claim after May 24, 2000 through the exercise of reasonable diligence, I concur in the result reached by the majority.